**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| GREGORY  HOGSTON,                           ) | |
|                                            ) | |
| Plaintiff,                ) | |
|                                            ) | |
| v.                      ) | Case No. 4:14-cv-00076-TWP-DML |
|                                            ) | |
| CAROLYN W. COLVIN, Acting Commissioner     ) | |
| of the Social Security Administration,      ) | |
|                                            ) | |
| Defendant.                ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Gregory Hogston ("Mr. Hogston"), requests judicial review of the final decision of the Defendant, Carolyn Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), following the Commissioner's denial of his application for Childhood Social Security Income under Section 223(d) of the Social Security Act ("Act"). *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.350(a)(5) (explaining that an award of child's benefits is warranted upon the earnings of an insured person who is entitled to benefits, if the applicant is eighteen years old or older and can establish disability that began before the applicant became twenty-two years old). For the reasons stated below, the Court affirms the Commissioner's decision.

## I.  BACKGROUND

### A.   Procedural History

Mr. Hogston was born on October 8, 1967.  In a previous disability determination, on July 27, 1994, an Administrative Law Judge ("ALJ") found Mr. Hogston to be disabled, with an onset date of January 1, 1990.  (Filing No. 21-1 at 43-49). In the initial determination, Mr. Hogston was found to have the following "severe" impairments: severe back pain, syncope, and excessive

fatigue.  As a result of the initial decision, on July 27, 1994, he began receiving adult Disability Insurance Benefits ("DIB"); and Mr. Hogston continues to receive benefits.

On January 19, 2011, Mr. Hogston applied for childhood benefits, alleging disability since his date of birth.  His application was denied initially, and again upon reconsideration and on June 8, 2011, Mr. Hogston submitted a written request for a hearing before an Administrative Law Judge.  On November 26, 2012, a hearing was held before an ALJ, via video, wherein Mr. Hogston, his mother, and a vocational expert testified.[1]  On December 28, 2012, the ALJ issued a decision that Mr. Hogston was not disabled at any time prior to the date he attained age twenty-two, (Filing No. 21-1 at 21-42.) On June 2, 2014, the Appeals Council denied Mr. Hogston's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.

On July 24, 2014, Mr. Hogston filed his appeal in this Court.  In his opening brief, he notes that the Social Security Administration ("SSA") failed to file a complete record of the proceedings below.  With the Court's permission, the SSA subsequently filed a supplemental transcript which contained a complete record of the evidence relied upon by the ALJ in making his final decision.

**B.**    **Relevant Medical History**

Mr. Hogston contests the ALJ's determination that he was not disabled based on low intellectual functioning, syncopal episodes, and residual pain from a left ankle injury.  Therefore, the Court will discuss only the relevant facts regarding these three impairments.

Prior to his twenty-second birthday, Mr. Hogston had some part-time work history that was considered by the ALJ.  Specifically, from May 1986 through September 1987, he worked in food services at a nursing home; from May 1988 to June 1990, he worked as a carry-out helper at a garden center. After his twenty-second birthday, Mr. Hogston worked as a cashier at Wal-Mart.

---

[1] Mr. Hogston did not appear in person because he was recuperating from back surgery in a nursing home.

### 1.   __Intellectual Functioning__

In September 1975 and November 1976, Mr. Hogston's school records show testing that revealed an IQ of 105 and 102, respectively.  (Filing No. 21-3 at 2.)  He received low and failing grades in elementary school, primarily consisting of Cs, Ds, and Fs.  *Id*. at 356.  Mr. Hogston took a few special education classes in high school, and graduated with a 2.0 grade point average. (Filing No. 21-2 at 177; Filing No. 21-3 at 1-4, 6.)

In October 1982, at the age of fifteen, Mr. Hogston underwent testing of the Wechsler Intelligence Scale for Children ("WISC-R") to determine his eligibility for special education classes.  (Filing No. 21-2 at 170-175.)  The WISC-R testing indicated that he had a full-scale IQ of 77, verbal IQ of 72, and performance IQ of 86.  *Id*. at 170.  The test administrator, Rick Rieman ("Mr. Rieman"), noted that Mr. Hogston followed directions poorly, did not complete his homework, had a short attention span, grew easily distracted, and could not finish one task before "jumping to something else."  *Id*. at 174.  However, Mr. Rieman reported that, although Mr. Hogston's demonstrated "ability level is lower than most students' in the regular classes, it is higher than those in the program for the mildly mentally handicapped."  *Id*.  Mr. Rieman further noted that Mr. Hogston's "borderline WISC-R ability level is also not typical for a Learning Disabled student" and his "total profile is most suggestive of a slow learner who has missed the basics and fallen so far behind that he cannot "catch-up"."  *Id*.   Finally, Mr. Rieman explained that "even though some students have been placed who have borderline ability, [Mr. Hogston's] low average performance I.Q. score would make this placement questionable."  *Id*. at 174.

In November 1989 (one month after his twenty-second birthday), Mr. Hogston saw his treating psychiatrist, Joseph Edwards ("Dr. Edwards"), who was treating Mr. Hogston for

depression and anxiety. Dr. Edwards assessed Mr. Hogston as having an "average IQ" based upon his use of language and his "fund of knowledge". (Filing No. 21-5 at 37.)

In August 1992, Mr. Hogston underwent a mental evaluation, performed by W. Michael Nelson ("Dr. Nelson"). Dr. Nelson diagnosed Mr. Hogston with post-traumatic stress disorder, bulimia nervosa, and developmental reading disorder. Dr. Nelson opined that Mr. Hogston functioned in the borderline to low average range of intelligence and was restricted in his daily activities and interests, and his ability to interact with others. (Filing No. 21-6 at 49-50.)

In March 2008, Mr. Hogston underwent a psychological evaluation for vocational rehabilitation purposes which included Wechsler Adult Intelligence Scale [WAIS-III] testing. The testing revealed that he had a full-scale IQ of 70, verbal IQ of 72, and performance IQ of 74. (Filing No. 21-3 at 7.) The administering psychologist, Michael H. Cecil ("Dr. Cecil"), opined that the full scale IQ score of 70 indicated the Mr. Hogston functioned in the mild mental retardation range of intellectual functioning, but that he had "high adaptive functioning." *Id*. at 8. Dr. Cecil reported that Mr. Hogston would function best in a structured and routine job setting, and would need to work slowly in order to be accurate. *Id*.

In May 2008, Joan Blackwood Davis ("Dr. Davis"), performed a consultative psychological evaluation for vocational purposes. Dr. Davis noted Mr. Hogston's history of having a learning disability as a child, and noted that while he had some deficits, he was "very self-sufficient and has worked well to manage his life." Dr. Davis opined that if Mr. Hogston were to work, he would need a supportive boss because he was prone to misunderstandings and could easily be manipulated by other people. *Id*.

In January 2011, Mr. Hogston's high school teacher and tutor, Mary Jo Sloan ("Ms. Sloan") and his reading teacher from elementary school, Theresa McCabe ("Ms. McCabe"), each drafted

letters in support of his disability application.  Ms. Sloan indicated that she "vividly" remembered Mr. Hogston's academic difficulties, including his "severe" difficulties decoding, reading for understanding, spelling, writing coherently, and calculating even the most basic math.  (Filing No. 21-2 at 92.)  She also reported that Mr. Hogston "had, and continues to have" difficulties with long and short term memory and he had debilitating emotional difficulties in high school and had been in counseling on and off since the age of eighteen.  *Id.*  Ms. McCabe wrote that Mr. Hogston "does have a learning disability in reading and has continued to need assistance in that field."  *Id.*

### 2.   Syncope

Mr. Hogston alleged that he has suffered syncopal episodes (fainting) since childhood. (Filing No. 21-1 at 28.)  However, Mr. Hogston has not identified any objective medical evidence, created before his twenty-second birthday on October 8, 1989, to demonstrate that he suffered from syncopal episodes prior to that date.  For instance, in July 1992, treating physician, H.S. Gill ("Dr. Gill") noted that Mr. Hogston suffered from syncope episodes, one to two times per month, and also suffered from numbness in his left ankle.  (Filing No. 21-6 at 39-40.)  On August 26, 1992, during an examination, Mr. Hogston alleged a longstanding history of dizzy spells associated with slow pulse and passing out.  (Filing No. 21-6 at 52.)  Dr. Gill's report indicates that the syncopal episodes "date into his early youth".  *Id.*  However Dr. Gill does not identify objective medical evidence, created before Mr. Hogston's twenty-second birthday, to show that the episodes occurred before Mr. Hogston turned twenty-two years old.  *Id.*

Similarly, on April 16, 2008, Mr. Hogston's treating physician, Thomas Broderick ("Dr. Broderick"), opined that Mr. Hogston had a "*longstanding history* of syncope of vasomotor insufficiency, which has resulted in previous syncopal/near syncopal episodes".  (Filing No. 21-3 at 15) (Emphasis added.)  However, Dr. Broderick did not reference any objective medical

evidence to suggest that Mr. Hogston began having syncopal episodes prior to turning twenty-two. Later, on June 22, 2012, Dr. Broderick opined that Mr. Hogston's syncope episodes began before age twenty-two, claiming that Mr. Hogston has had syncopal episodes "since grade/middle school". (Filing No. 21-5 at 39.)  Again, however, Dr. Broderick did not identify an objective evidence, created before Mr. Hogston's twenty-second birthday, to support his opinion.

### 3.  Left Ankle Condition

On July 14, 1989, Mr. Hogston had surgery to remove screws that had been affixed to his left ankle to remedy a fracture. (Filing No. 21-5 at 142.)  On September 27, 1989, Mr. Hogston aggravated his previous ankle injury when he fell twelve feet off of a stack of hay bales. *Id.* at 140.  Upon examination, Mr. Hogston was diagnosed with a calcaneus contusion, with no fracture, and his symptoms were expected to resolve "very quickly." *Id.*  By December 30, 1989, just two months after Mr. Hogston's twenty-second birthday, Mr. Hogston reported that he was jogging every evening.  (Filing No. 21-6 at 25.)

On April 15, 1992, during the time Mr. Hogston was working as a cashier, he saw a doctor and complained of ankle pain. *Id.* at 6.  He was diagnosed with slight degenerative changes and degenerative arthritis of his left ankle; and anti-inflammatories were recommended. *Id.*

## C.  The ALJ's Decision

At step one, the ALJ determined that Mr. Hogston had not engaged in substantial gainful activity since the alleged onset date of October 8, 1967.  (Filing No. 21-1 at 26.)  At step two, the ALJ determined that, prior to attaining the age of twenty-two, Mr. Hogston had the following severe impairments: residuals of a left ankle fracture; a ptotic right kidney; depression; post-traumatic stress disorder; and borderline intellectual functioning. *Id.* at 27.  At step three, the ALJ determined that, prior to attaining the age of twenty-two, Mr. Hogston did not have an impairment

or combination of impairments the meets or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 28. Specifically, the ALJ concluded that Mr. Hogston did not meet or medically equal Listing 12.05 Intellectual Disability[2]. *Id*.

The ALJ then determined Mr. Hogston's residual functional capacity ("RFC"). The ALJ determined that, prior to attaining the age of twenty-two, Mr. Hogston had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c), except for the following limitations:

> [Mr. Hogston] could have frequently crouched, crawled, knelt, stooped and climbed ramps and stairs; [Mr. Hogston] could not have balanced or climbed ladders, ropes or scaffolds; [Mr. Hogston] could not have worked around hazards such as unprotected heights or dangerous machinery; [Mr. Hogston] could not have driven automotive equipment; [Mr. Hogston] could have had no concentrated exposure to extreme temperatures or respiratory irritants; due to a moderate level limitation in attention, concentration, persistence and pace associated with depression, anxiety and [Borderline Intellectual Functioning], [Mr. Hogston] would have been limited to performing unskilled, simple, repetitive tasks; due to a moderate level restriction in social functioning associated with anxiety and depression, [Mr. Hogston] would have been limited to occasional contact with co-workers, supervisors and the public; due to a moderate level restriction in stress tolerance associated with anxiety and depression, [Mr. Hogston] would have been precluded from performing jobs involving rapid production pace work or strict production quotas and to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work setting from one day to the next; and [Mr. Hogston] would have been limited to performing jobs which would require no more than third-grade reading and math skills.

*Id*. at 30-31.

The ALJ then determined that Mr. Hogston had no past relevant work. *Id*. at 34. At the final step of the evaluation process, the ALJ determined that, prior to attaining the age of twenty-two, there were jobs that existed in the national economy that Mr. Hogston could perform. *Id*. at 35. The ALJ relied on the testimony of a vocational expert to make this determination. *Id*.

---

[2] At the time of the ALJ's decision, this Listing was titled "Mental Retardation".

Accordingly, the ALJ concluded that Mr. Hogston was not disabled prior to the age of twenty-two and was, therefore, not eligible for Childhood Social Security Income. *Id*. at 36.

## II. DISABILITY STANDARD AND REVIEW

Under the Act, a claimant is entitled to DIB or SSI if he establishes he has a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). To justify a finding of disability, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a severe impairment that significantly limits his ability to perform basic work activities, and that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(iii). In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96–

8p).  At step four, if the claimant is able to perform his past relevant work, he is not disabled.  20

C.F.R. § 416.920(a)(4)(iv).  At step five, if the claimant can perform any other work in the national

economy, he is not disabled.  20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, the Court must uphold the ALJ's findings of fact if the

findings are supported by substantial evidence and no error of law occurred.  *Dixon v. Massanari*,

270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 42 U.S.C. § 405(g).  "Substantial evidence means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Dixon*, 270 F.3d at 1176.  Further, this Court may not reweigh the evidence or substitute its

judgment for that of the ALJ.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  While the

Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the

decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or

missing premises fails to build a logical bridge between the facts of the case and the outcome."

*Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be

based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th

Cir. 1994).  The ALJ is required to articulate only a minimal, but legitimate, justification for his

acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700

(7th Cir. 2004).

### III. DISCUSSION

Mr. Hogston raises the following challenges to the ALJ's opinion: the ALJ erred in his evaluation of Listing 12.05; the ALJ did not properly consider the opinions of his treating physicians; that the ALJ failed to employ a medical expert to determine the proper onset date; and the ALJ did not properly consider the evidence of Mr. Hogston's ankle injury when promulgating his RFC determination. None of these challenges justify remand.

### A. Listing Determination

Mr. Hogston first argues that the ALJ erred in his evaluation of Listing 12.05, Intellectual Disability. 20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.05. Specifically, Mr. Hogston argues that the ALJ failed to properly analyze the "additional and significant work-related limitation" portion of Subpart C and failed to evaluate whether his mental impairments medically equaled the Listing.

Listing 12.05 applies when a claimant has an intellectual disability, characterized by "significantly subaverage general intellectual function with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.05. To be found disabled under this Listing, Mr. Hogston must satisfy the requirements of Subparts A, B, C, or D. *Id*.

The ALJ evaluated all four Subparts. However, Mr. Hogston takes issue with the ALJ's evaluation of the Subpart C criteria. To meet the required severity level under Subpart C, Mr. Hogston must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function". *Id*. When evaluating this Subpart, the ALJ stated as follows,

> In terms of the requirements in [Subpart] C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a

> physical or other mental impairment imposing an additional and significant work-related limitation of function.  Although the claimant has consistently received IQ scores above 70, he did score a 70 in terms of his full scale IQ in 2008.  Even though the undersigned finds that other IQ scores more accurately reflect the claimant's cognitive abilities, the undersigned has proceeded to analyze the claimant's [Borderline Intellectual Functioning] under this paragraph of the listing.

(Filing No. 21-1 at 29) (internal citations omitted).  Thereafter, under the Subpart D criteria, the ALJ extensively evaluated the functional limitations of Mr. Hogston's intellectual restrictions, in terms of daily living (mild difficulty); social functioning (moderate difficulty); concentration, persistence or pace (moderate difficulty); and episodes of decompensation (none).  (Filing No. 21-1 at 29-30.)

## 1.   <u>Intellectual Impairments as an "Additional Work-Related Limitation of Function"</u>

First, Mr. Hogston assert that the ALJ did not properly assess his intellectual impairments as "an additional and significant work-related limitation of function", and he raises several challenges in this regard.  For instance, Mr. Hogston argues that Dr. Cecil's diagnosis of mild mental retardation, by itself, is sufficient to satisfy the additional adaptive functioning criteria of the Listing, citing the DSM-IV criteria in support.  However, contrary to Mr. Hogston's assertion, a treating physician's use of the DSM-IV criteria does not control the Commissioner's disability determination.   Instead, the ALJ's evaluation of the medical evidence under the relevant regulations and the parameters of the Listings are controlling.  20 C.F.R. § 404.1527(d)(1) ("[the Commissioner is] responsible for making the determination or decision about whether you meet the statutory definition of disability").  As a result, the ALJ was required to look beyond Mr. Hogston's medical diagnosis and independently assess the evidence, or lack thereof, supporting the Listing criteria.

Second, Mr. Hogston argues that the ALJ improperly found his intellectual impairments to be less severe than the record evidence suggests, again citing the DSM-IV criteria and suggesting competing conclusions regarding the evidence of Mr. Hogston's intellectual limitations.  In this regard, the Court reminds Mr. Hogston that it does not decide the facts anew, re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Instead, where the ALJ has provided an adequate discussion of the evidence and the ALJ's conclusions are supported by the record evidence, the Court is not at liberty to overturn the factual findings of the ALJ.  *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) (noting that a reviewing court is deferential to the ALJ's factual findings, does not substitute its own opinion for that of the ALJ, and does not re-weigh the evidence); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing an ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

In his evaluation of the Subpart D criteria, the ALJ conducted a complete and thorough review of Mr. Hogston's intellectual limitations, assessing Mr. Hogston's functioning in the four functional domains.  (Filing No. 21-1 at 29-30.)  Specifically, under the Subpart D criteria, the ALJ extensively evaluated the functional limitations of Mr. Hogston's intellectual restrictions in terms of daily living (mild difficulty); social functioning (moderate difficulty); concentration, persistence or pace (moderate difficulty); and episodes of decompensation (none).  *Id.*  The Court considers this analysis to be well-developed and adequately supported by evidence in the record. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) ("[t]he ALJ is not required to mention every piece of evidence by must provide an accurate and logical bridge between the evidence and the

12

conclusion"). Further, Mr. Hogston's argument that the ALJ would have found his intellectual conditions to be disabling if he had instead relied on the DSM-IV criteria falls flat, as the Court notes that the Listing's functional domains are similar to the DSM-IV criteria advocated by Mr. Hogston (*See, e.g.*, Filing No. 28 at 13) (identifying the following DSM-IV functional impairments: communication, self-care, home living, social/interpersonal skills, work, leisure, health, and safety).

Third, Mr. Hogston argues that, because the ALJ concluded that he had "moderate" difficulties in two domains (social functioning and concentration, persistence or pace) under the Subpart D criteria, the ALJ should have concluded that his intellectual impairments resulted in a "significant work-related limitation of function" under the Subpart C criteria.  However, this argument is illogical.  If the ALJ's finding of two "moderate" limitations was not sufficient to meet the severity under the Subpart D criteria, which requires at least two "marked" limitations, it cannot be that the Subpart C criteria would demand a lesser restriction in functioning. *See* 20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.05.  If the Court were to follow Mr. Hogston's argument, it would, in effect, render Subpart D meaningless as an independent method for establishing severity under the Listing.

ALJ properly assessed Mr. Hogston's intellectual impairments as "an additional and significant work-related limitation of function" and remand is not warranted on this issue.

### 2.   Physical Impairments as an "Additional Work-Related Limitation of Function"

Mr. Hogston also argues that the ALJ did not properly assess his physical impairments as "an additional and significant work-related limitation of function".  However, besides minimally identifying a potential omission in the ALJ's opinion, he makes no argument to demonstrate how the evidence of his physical impairments meets the requisite severity required by the Listing.  (*See*

Filing No. 28 at 11.)  Mr. Hogston does not identify any facts to support this argument, and makes

no mention of the argument in his reply brief.  (*Id.*; Filing No. 30.)

Thus, Mr. Hogston did not meet his primary burden of showing that his impairments satisfy

the criteria specified in Subpart C of the Listing.  *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th

Cir. 2006) ("[a] claimant has the initial burden of presenting medical evidence to demonstrate that

his impairments satisfy all of the requirements in a Listing"); *Knox v. Astrue*, 327 Fed. App'x 652,

655 (7th Cir. 2009) (unpublished opinion); 20 C.F.R. § 404.1512.   Only after a claimant has

submitted evidence to support that the Listing's criteria is met or medically equaled does the ALJ

have a duty to mention and discuss a specific Listing.  *Knox*, 327 Fed. App'x at 655 ("[a]lthough

an ALJ should provide a step-three analysis, a claimant first has the burden to present medical

findings that match or equal in severity all the criteria specified by a listing"); 20 C.F.R. § 404.1512

("[i]n general, you have to prove to us that you are blind or disabled. You must inform us about or

submit all evidence known that relates to whether or not you are blind or disabled.")

As a result, without evidence to support his argument that his physical limitations were

severe enough to qualify as an "additional and significant work-related limitation of function", the

ALJ cannot be said to have erred by not discussing Mr. Hogston's physical limitations when

evaluating the Subpart C criteria.

### 3.   **Medical Equivalence**

Finally, Mr. Hogston argues that, although the ALJ evaluated whether his intellectual

impairments met Listing 12.05, the ALJ erred by not also evaluating medical equivalence.

However, Mr. Hogston's argument in this regard fails for the same reason that his argument

regarding his physical limitations fails.   Specifically, Mr. Hogston did not meet his burden of

presenting sufficient facts or argument to demonstrate that the evidence supports medical

equivalence.  *See Ribaudo*, 458 F.3d at 583; *Knox*, 327 Fed. App'x at 655; 20 C.F.R. § 404.1512. In support of his equivalence argument, Mr. Hogston only identifies his diagnosis of borderline intellectual functioning.  (*See* Filing No. 27-28.)  However, as already explained, a medical diagnosis alone is insufficient to establish the exacting criteria of a Listing. 20 C.F.R. § 404.1527(d)(1).  If that were the case, there would be no need for an administrative hearing before an ALJ, as a claimant would only have to submit a medical diagnosis to obtain disability benefits. Instead, Mr. Hogston had the burden to put forth evidence establishing medical equivalence in order to trigger the ALJ's duty to evaluate it.  Mr. Hogston has not met that burden, and the Court, therefore, finds no error.

**B.    Treating Physicians and other Opinion Evidence**

Mr. Hogston argues that the ALJ improperly discounted the opinions of his treating physicians, Dr. Broderick and Dr. Cecil; failed to consider the opinions of Dr. Nelson and Dr. Gill; and did not properly evaluate the lay opinions of his teachers.

A treating physician's opinion regarding the nature and severity of a medical condition is ordinarily entitled to controlling weight if the opinion is well supported by the medical findings and is consistent with substantial evidence in the record.  *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).  More weight is generally afforded a treating physician's opinion because he is more familiar with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 416.927(c)(2).

However, while the treating physician's opinion is important, it is not the final word on a claimant's disability.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); 20 C.F.R. § 404.1527(d)(1).  Accordingly, if a treating physician's medical opinion is internally inconsistent or inconsistent with other evidence in the record, an ALJ is entitled to give the opinion lesser

weight. *Schmidt*, 496 F.3d at 842.  Indeed, when evidence in opposition to the presumption is introduced, the rule drops out and the treating physician's opinion becomes "just one more piece of evidence for the ALJ to weigh." *Hofslien*, 439 F.3d at 377.

An ALJ's decision to give lesser weight to a treating physician's opinion is afforded deference, so long as the ALJ minimally articulates his reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2011); *Copeland v. Astrue*, 3:09-CV-431-JD, 776 F. Supp. 2d 828, 836 (N.D. Ind. Mar.1, 2011); 20 C.F.R. § 404.1527(c)(2) ("[w]e will always give good reasons in our notice of determination of decision for the weight we give your treating source's opinion."). The Seventh Circuit has characterized this deferential standard as "lax." *Berger*, 516 F.3d at 545; *Brown v. Astrue*, No. 1:10-CV-1035-SEB, 2011 WL 2693522, *3 (S.D. Ind. July 8, 2011).

Nevertheless, once an ALJ decides to give lesser weight to a treating physician's opinion, the ALJ still must determine what weight the physician's opinion is due under the applicable regulations. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). Factors the ALJ should consider when determining the weight to give the treating physician's opinion include the length, nature, and extent of the treatment relationship, whether the physician supported his opinion with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

### 1.    Opinions of Dr. Broderick and Dr. Cecil

Mr. Hogston argues that the ALJ failed to give controlling weight to the opinions of his treating physicians, Dr. Broderick and Dr. Cecil, in regard to their opinions of syncopal episodes occurring prior to his twenty-second birthday.

In his decision, the ALJ gave little weight to the assessments of Dr. Broderick and Dr. Cecil.  The ALJ acknowledged Dr. Broderick's report that Mr. Hogston "suffered syncopal episodes since childhood", but noted that the record does not document that fact.  (Filing No. 21-1 at 33). Similarly, regarding the weight afforded to the opinion of Dr. Cecil, the ALJ concluded, "[because this assessment does not pertain to the pertinent period], the undersigned gives no weight to the assessment of Michael Cecil Psy.D."  *Id*.

The Court finds no error in the ALJ's reasons for discounting these opinions for the reasons stated.  Importantly, Mr. Hogston has not identified any objective medical evidence, created before his twenty-second birthday, to demonstrate that he suffered from syncopal episodes prior to that date.  As a result, the ALJ's justification for discounting these opinions is supported by the record.  *See* 20 C.F.R. § 404.1527(c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Accordingly, the ALJ's reasons for discounting the opinions of Dr. Broderick and Dr. Cecil is entitled to deference, as it is adequately supported and sufficiently articulated.  *See Berger*, 516 F.3d at 545; *Copeland*, 776 F. Supp. 2d at 836.

### 2.     Opinions of Dr. Nelson and Dr. Gill

Mr. Hogston also argues that the ALJ failed to consider the opinions of Dr. Nelson and Dr. Gill.  This argument is initially appealing, as a review of the ALJ's decision reveals no discussion of these opinions.  However, the Court notes that Mr. Hogston makes no effort to explain how this omission harmed his case.  Mr. Hogston makes no argument to suggest that the omission of these

opinions materially affected the ALJ's RFC determination; nor does he explain how the inclusion of these opinions would have resulted in more severe limitations than those identified by the ALJ.

For instance, Mr. Hogston notes that Mr. Gill opined that he suffered from syncopal episodes twice a month and that he suffered from numbness in his left ankle. (Filing No. 28 at 24.) However, the ALJ explained the relevant portions of his RFC determination as follows,

> To accommodate the lingering effects of the claimant's fractured ankle . . ., the undersigned limited the claimant to performing medium work subject to additional postural and environmental limitations. The undersigned specifically prohibited the claimant from driving automotive equipment due to his alleged problems with syncope even though the evidence does not establish a severe impairment prior to the claimant's 22nd birthday.

(Filing No. 21-1 at 31-32.) The ALJ's specific postural limitations included "frequent" crouching, crawling, kneeling, stooping and climbing ramps and stairs; no balancing and no climbing ladders, ropes or scaffolds; and no working around hazards such as unprotected heights or dangerous machinery. *Id.* at 30. In addition, the ALJ found Mr. Hogston to be restricted from driving automotive equipment. *Id.* at 30.

Mr. Hogston's does not explain how Dr. Gill's opinion suggests more severe limitations in functioning than those identified in the ALJ's RFC determination because of his ankle numbness. Similarly, Mr. Hogston does not point to any evidence, including Dr. Gill's opinion, to suggest additional limitations because of his questionable syncopal episodes.

Mr. Hogston's argument regarding the omission of Dr. Nelson's opinion fares no better. He notes that Dr. Nelson opined that Mr. Hogston functioned in the borderline-to-low average range of intelligence and was restricted in daily activities and interests, his ability to interact with others, and his ability to deal with the public on an extended basis. (Filing No. 28 at 24.) However, the ALJ explained the relevant portions of his RFC determination as follows,

> Due to the claimant's mental problems including . . . [Borderline Intellectual Functioning], the undersigned has limited the type of work that the claimant can perform, the interaction he can tolerate in the work setting, and the setting in which he can work.  Specifically, the undersigned has limited the claimant to work that involves no more than third-grade reading and math skills based on the results of an academic achievement testing.

(Filing No. 21-1 at 32) (citing the October 1982 WISC-R intelligence test and other intellectual testing preformed prior to the alleged onset date: Filing No. 21-2 at 170-78; Filing No. 21-3 at 1-5.)  Specifically, the ALJ made the following limitations based on Mr. Hogston's intellectual functioning,

> [D]ue to a moderate level limitation in attention, concentration, persistence and pace associated with depression, anxiety and [Borderline Intellectual Functioning], [Mr. Hogston] would have been limited to performing unskilled, simple, repetitive tasks; due to a moderate level restriction in social functioning associated with anxiety and depression, [Mr. Hogston] would have been limited to occasional contact with co-workers, supervisors and the public; due to a moderate level restriction in stress tolerance associated with anxiety and depression, [Mr. Hogston] would have been precluded from performing jobs involving rapid production pace work or strict production quotas and to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work setting from one day to the next; and [Mr. Hogston] would have been limited to performing jobs which would require no more than third-grade reading and math skills.

(Filing No. 21-1 at 30-31.)  In his brief, Mr. Hogston does not explain how Dr. Nelson's opinion suggests more severe limitations in functioning because of his intellectual impairments.

For these reasons, the Court concludes that the ALJ's failure to specifically discuss the opinions of Dr. Gill and Dr. Nelson, if an error, was a harmless one.  *See Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("[h]armless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits"); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision").  *See also Salt River Project Agric. Improvement and Power Dist. v. U.S.*, 762 F.2d 1053, 1060 n. 8 (D.C. Cir. 1985) ("[w]hen it is clear that based on the valid

19

findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming.").  As a result, remand is not appropriate for this reason.

### 3.   Opinions of Mr. Hogston's Teachers

Finally, Mr. Hogston argues that the ALJ did not properly evaluate the lay opinions of his teachers.  To begin, Mr. Hogston's teachers, Ms. Sloan and Ms. McCabe, do not qualify as treating sources under the regulations and, therefore, the ALJ was not required to afford their opinions controlling weight.  *See* SSR 06-03p ("only acceptable medical sources can be considered treating sources . . . whose medical opinions may be entitled to controlling weight"); *Wools v. Astrue*, No. 3:07-cv-135-WGH-RLY, 2009 WL 1148219, at *11 (S.D. Ind. Apr. 28, 2009).  The regulations define a treating source as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Instead, Mr. Hogston's teachers qualify as "non-medical sources", educational personnel, whose opinions may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function" but not to establish the existence of a medically determinable impairment.  SSR 06-03p.

In his decision, the ALJ gave Ms. Sloan's report "little weight" because it reflected her recollection from thirty years ago.  (Filing No. 21-1 at 33-34.)  Similarly, the ALJ gave Ms. McCabe's assessment "little weight" for the same reason.  *Id*. at 34.  By rule, these opinions are not entitled to controlling weight; and there is nothing in the record to contradict the ALJ's reason for discounting these opinions.  *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (noting that an ALJ's factual conclusions are entitled to deference if they are supported by substantial evidence in the record); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) ("substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). The ALJ's duty, with regards to these opinions, was to consider them and minimally discuss the weight afforded to them. The ALJ has met that minimal duty, therefore, remand not appropriate for this reason as well. *See Elder*, 529 F.3d at 413 (noting that, if the Commissioner's decision is adequately supported, the Court must affirm it, "even if reasonable minds could differ" about the disability status of the claimant).

**C.**   **Medical Expert to Determine Onset Date**

Mr. Hogston also argues that the ALJ failed to employ a medical expert to determine the proper onset date. This argument is neither well developed nor clearly explained. There is no dispute over the alleged onset date, which was Mr. Hogston's date of birth. (*See* Filing No. 21-1 at 24) ("the claimant filed for child's insurance benefits, alleging disability beginning October 8, 1967.") As such, it cannot be argued that the ALJ failed to evaluate the evidence within the relevant time period. Instead, it appears that Mr. Hogston is arguing that the ALJ should have employed a medical expert to determine when Mr. Hogston began experiencing syncopal episodes, given the lack of objective medical evidence of such episodes before Mr. Hogston's twenty-second birthday. This argument, however, is flawed for two reasons.

First, Mr. Hogston has the duty to present evidence to establish a disability from the relevant time period. 20 C.F.R. § 404.1512 ("[i]n general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known that relates to whether or not you are blind or disabled."). Given the lack of record evidence to support his claim of syncopal episodes occurring between Mr. Hogston's date of birth and his twenty-second birthday, Mr. Hogston cannot now claim that a factual ambiguity exists that the ALJ failed to resolve. *See* SSR 83-20 at *3 ("the established onset date must be fixed based on the facts and can never be

inconsistent with the medical evidence of record").  It was Mr. Hogston's duty to present evidence from the relevant time period that would establish his claim, and he did not.  Further, as already discussed, the evidence presented by Mr. Hogston to suggest syncopal episodes occurring during the relevant time period, namely the opinions of Dr. Broderick and Dr. Cecil, was adequately discounted by the ALJ as being not supported by objective medical evidence.

Second, under Seventh Circuit precedent, the ALJ only had an affirmative duty to employ a medical expert if he found Mr. Hogston's syncope to be disabling and Mr. Hogston had presented ambiguous evidence that required the ALJ to make an inference regarding the onset date.  *See Briscoe v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005) ("[w]here . . . a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability"); *Pierce v. Astrue*, 907 F. Supp. 2d 941, 949-52 (N.D. Ill. 2012) (discussing the ALJ's duty to employ the SSR 83-20 analytical framework to determine the onset date of a condition that was determined to be disabling); *Freeman v. Astrue*, 816 F. Supp. 2d 611, 616 (E.D. Wis. 2011). Specifically, in cases wherein an ALJ has already determined an impairment to be disabling but there is not sufficient evidence to establish a precise onset date, the Seventh Circuit has recognized that an ALJ has a duty to employ a medical expert, or seek input from the claimant's family members and friends, to infer an onset date.  *Briscoe*, 425 F.3d at 352-53 (concluding that there was not sufficient evidence to determine an onset date because the claimant's disabling condition was a "slowly progressive impairment", thereby triggering the SSR 83-20 analytical framework); *Pierce*, 907 F. Supp. 2d at 949-52.

Although the ALJ in the initial disability determination found Mr. Hogston to have the severe impairment of syncopal episodes, (*See* Filing No. 21-1 at 47.), Mr. Hogston has presented

neither evidence nor argument to suggest that his syncope was a "slowly progressive impairment" or that his syncope otherwise had an unprecise onset date which would trigger the SSR 83-20 analytical framework.  Instead, Mr. Hogston presented objective medical evidence documenting syncopal episodes occurring after his twenty-second birthday and well after his date of birth (the alleged onset date).

Further, as the ALJ pointed out, the only evidence suggesting that syncopal episodes may have occurred during the relevant period are the unsubstantiated opinions of two of Mr. Hogston's treating physicians, created several years after Mr. Hogston's twenty-second birthday.  As already discussed, the ALJ properly discounted these opinions for not being supported by objective medical evidence.  Without objective evidence to support these opinions, it is safe to assume that those opinions may have been supported solely by the claimant's own reports, which cannot establish a disability.  As the regulations explain,

> statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R. § 404.1529(a).

Therefore, under the circumstances of this case, the ALJ was not required to consult a medical expert to determine the onset date of Mr. Hogston's syncopal episodes.

**D.**     **Evaluation of Evidence Relating to Mr. Hogston's Foot Injury**

Finally, Mr. Hogston argues that the ALJ did not properly consider the evidence of his ankle injury when accessing his RFC.  Specifically, Mr. Hogston contends that the ALJ's conclusion that he could still perform a medium level of work is inconsistent with the ALJ's factual determination that he experienced ongoing ankle pain during the relevant period.

Residual functional capacity is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p.  This finding must be assessed based on all the relevant evidence in the record and must be supported by substantial evidence.  *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000); 20 C.F.R. § 404.1545(a)(1).  However, the ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one.  *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e).  Accordingly, a reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, as long as the ALJ builds a logical bridge from the evidence to his conclusion.  *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005).

As previously discussed, the ALJ has adequately considered and substantially discussed the evidence supporting his RFC determination and the limiting effects of Mr. Hogston's ankle condition in particular.  (*See* Filing No. 21-1 at 30-31.)  Where, as here, the ALJ has provided an adequate discussion of the evidence and the ALJ's conclusions are supported by the record evidence, the Court is not at liberty to overturn the factual findings of the ALJ.  *See Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005) (noting that a reviewing court is deferential to the ALJ's factual findings, does not substitute its own opinion for that of the ALJ, and does not re-

24

weigh the evidence); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing an ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it.").

Mr. Hogston attempts to convince the Court to reweigh the evidence, something it cannot do. *See Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Accordingly, the Court concludes that the ALJ did not error in evaluating the limiting effects of Mr. Hogston's ankle condition.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Mr. Hogston's request for remand, is **DENIED** and the Commissioner's final decision is **AFFIRMED**. The Court will enter final judgment by separate order.


   **SO ORDERED.**


Date: 1/22/2016

 

 

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

David F. Chermol
CHERMOL & FISHMAN, LLC
dave@ssihelp.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov